## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| ADMIRAL INSURANCE COMPANY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION FILE NO.** |
| | ) | _____ |
| SHEET METAL MASTERS, INC. and | ) | |
| WHITESELL-GREEN, INC. | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Admiral Insurance Company ("Admiral") files this Complaint for Declaratory Judgment.

## PARTIES

### 1.

Admiral is incorporated under the laws of Delaware with its principal place of business in Arizona. Admiral seeks a declaration of its coverage obligations, if any, owed to Sheet Metal Masters, Inc. ("SMM") for claims asserted by Whitesell-Green, Inc. ("WGI"). For purposes of federal court jurisdiction, Admiral is a citizen of both Delaware and Arizona.

2.

Defendant SMM is incorporated under the laws of Florida with its principal place of business in Florida. It may be served through its registered agent, William Cockrell, at 2150 Windham Dr., Molino (Escambia County), Florida 32577.  For purposes of federal court jurisdiction, SMM is a citizen of Florida.

3.

Defendant WGI is incorporated under the laws of Florida with its principal place in Florida. WGI may be served through its registered agent, William K. Whitesell, Jr., at 3881 N. Palafox St., Pensacola (Escambia County), Florida 32505. For purposes of federal court jurisdiction, WGI is a citizen of Florida.

**JURISDICTION**

4.

There is complete diversity of citizenship between Admiral, who is a citizen of Arizona and Delaware, and Defendants, who are citizens of Florida.

5.

The amount in controversy exceeds $75,000.

6.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7.

A case or controversy exists to support Admiral's claim for declaratory relief under 28 U.S.C. § 2201.

8.

Venue is proper in the Pensacola Division of the Northern District of Florida where both defendants reside.  28 U.S.C. § 1391(b).

## LIABILITY FACTS

9.

On or about January 13, 2015, SMM entered into a subcontract with WGI, the general contractor, to perform structural steel erection work at two buildings that were used primarily for short-term residences at Corry Field Navy Air Station in Pensacola, Florida.  A true and complete copy of this subcontract, which is referred to herein as the "Steel Erection Subcontract," is attached as Exhibit A.

10.

The Steel Erection Subcontract was a labor-only contract under which WGI provide the materials for SMM. Another subcontractor, E-Kelly, Inc., performed framing work in conjunction with SMM to construct what was referred to as a "progressive collapse system".

11.

Also on or about January 13, 2015, SMM entered into a contract with WGI to install a standing seam metal roof and light gauge metal trusses.  A true and complete copy of this contract, which is referred as the "Roofing Subcontract," is attached as Exhibit B.

12.

SMM began to perform work under the Steel Erection Subcontract on or around December 15, 2015. However, WGI's slow delivery of necessary materials and other problems with WGI's management of the project impeded SMM's ability to perform the contracted work. As of April 30, 2016, therefore, SMM was only able to install the steel tracks for studs to be installed for the shear walls and had not performed any of its braced framing system work.

13.

Progress was made in the ensuing months on the progressive collapse system and the brace framing system work.  However, on or about November 21, 2016, the engineer of record for the Naval Facilities Engineering Command Southeast ("NAVFAC") ordered that the progressive collapse system in the ceiling be repaired, replaced and corrected, finding it to be unsatisfactory.  Then, in January 2017, the NAVFAC engineer ordered the removal of drywall in a few areas so that the braced framing system could be inspected. Upon inspection, the NAVFAC

engineer ordered that all drywall over the entire braced framing system be removed so that the braced framing system could be repaired, replaced and corrected.

14.

On February 16, 2017, WGI issued a formal notification of alleged defective work relating to the progressive collapse system and the braced framing system. WGI issued additional formal notices on February 23, 2017, March 3, 2017, and April 5, 2017.

15.

SMM performed repair work on the progressive collapse system and the braced framing system up to May 24, 2017 when WGI allowed SMM to cease work on the Steel Erection Subcontract and retained other subcontractors to remediate the progressive collapse system and the braced framing system. After May 24, 2017, SMM performed work on the Roofing Subcontract only.

16.

According to WGI, the project was substantially completed on November 18, 2019, and the Navy accepted the two buildings on July 27, 2020.

17.

Meanwhile, WGI filed separate arbitration claims with the American Arbitration Association against SMM and three other subcontractors that were involved in the project: E. Kelly Enterprises, Inc.; Rudd & Son Welding, Inc.; and

Ton, Inc. A true and complete copy of the arbitration claim against SMM, which was filed on October 15, 2019 and assigned case number 02-19-0003-9880, is attached as Exhibit C.

18.

In its original Statement of Claim, WGI asserted that SMM's welding work for the progressive collapse system and the braced framing system was defective and incomplete and that SMM inadequately installed (or failed to install) hold downs, hold down anchors, clips and strap plates/braces. WGI alleged that it was necessary to perform substantial work to repair, replace and correct WGI's defective work which required removal of components of the project to access and correct SMM's defective work. WGI also asserted that SMM damaged other components of the project, primarily while performing repairs and remediation between December 2016 through May 24, 2017.

19.

WGI's arbitration claims against the four subcontractors were consolidated. On December 31, 2021, WGI filed a "Detailed Statement of Claim" against the subcontractors, a true and complete copy of which is attached as Exhibit D.

20.

On May 16, 2022, the arbitrators issued an Interim Award, a true and complete copy of which is attached as Exhibit E.

## COVERAGE PROVISIONS

21.

Admiral agreed to defend SMM pursuant to a reservation of rights under three general liability insurance policies that were issued to SMM as the named insured for the following periods:

CA 000021399-01 for April 29, 2015 to April 29, 2016 ("2015 Policy")
CA 000021399-02 for April 29, 2016 to April 29, 2017 ("2016 Policy")
CA 000021399-03 for April 29, 2017 to April 29, 2018 ("2017 Policy)

True and complete copies of these policies are attached as Exhibits F, G and H.

22.

The Admiral policies were delivered in Florida and each provides a limit of $1,000,000 per occurrence and $2,000,000 in the aggregate. Because their operative provisions are the same with respect to SMM's coverage, they are occasionally referred to in the singular as the "Admiral Policy."

23.

Under each policy, and in relevant part, Admiral agreed to "pay those sums the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies." To be covered, the "property damage" must occur during the policy period and be caused by an "occurrence."  Further, "property damage" is defined as "physical injury to tangible property" as well as "loss of use of tangible property that has not been physically injured." The term

"occurrence" is defined as "an accident, including continuous or repeated exposure to the substantially the same general harmful conditions." Coverage for "property damage" that falls within these provisions is subject to compliance with policy conditions as well as exclusions.

24.

Under Exclusion (b) the insurance does not apply to:

> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
>
> (1)    That the insured would have in the absence of the contract or agreement; or
>
> (2)    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract" reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
>
> > (a)    Liability to such party for, or for the cost of that party's defense has also been assumed in the same "insured contract"; and
> >
> > (b)    Such attorney's fees and litigation expenses are for defense of that party against civil or alternative dispute resolution proceedings in which damages to which this insurance applies are being alleged.

25.

The term "insured contract," as incorporated into Exclusion (b), is

defined in pertinent part as follows:

> That part of any other contract or agreement pertaining to
> your business (including an indemnification of a
> municipality in connection with work performed for a
> municipality) under which you assume the tort liability of
> another party to pay for "bodily injury" or "property
> damage" to a third person or organization, provided the
> "bodily injury or "property damage" is caused, in whole
> or in part, by you or by those acting on your behalf.
> However, such part of a contract or agreement shall only
> be considered an "insured contract" to the extent your
> assumption of the tort liability is permitted by law.  Tort
> liability means a liability that would be imposed by law
> in the absence of any contract or agreement.

26.

Under Exclusion (j) the insurance does not apply in pertinent part to:

> "Property damage" to:
>
> *        *        *
>
> (5)     That particular part of real property on which you
>         or any contractors or subcontractors working
>         directly or indirectly on your behalf are performing
>         operations, if the "property damage" arises out of
>         these operations; or
>
> (6)     That particular part of any property that must be
>         restored, repaired or replaced because "your work"
>         was incorrectly performed on it.
>
> *        *        *

9

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

27.

The term "your work" is defined as follows:

"Your work":

a.    Means:

(1)    Work or operations performed by you or on your behalf; and
(2)    Materials, parts or equipment furnished in connection with such work or operations.

b.    Includes:

(1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
(2)    The providing of or failure to provide warnings or instructions.

28.

"Products-completed operations hazard" is defined as follows:

a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)    Products that are still in your physical possession; or

(2)    Work that has not yet been completed or abandoned.  However, "your work" will be

deemed completed at the earliest of the following times:

(a)     When all of the work called for in your contract has been completed.

(b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b.     Does not include "bodily injury" or "property damage" arising out of:

(1)     The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2)     The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3)     Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

11

29.

Under Exclusion (l) the insurance does not apply to:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

30.

Under Exclusion (m) the insurance does not apply to:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1)   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2)   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

31.

The term "impaired property" is defined as follows:

> "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a.   It incorporates "your product" or "your work" that is known or thought to be deficient, inadequate or dangerous; or

b.   You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

32.

An endorsement entitled "SPECIAL EXCLUSIONS – JOINT FORM,"

modifies coverage to exclude claims for "pre-existing damage" as follows:

This insurance does not apply to:

1.   Any damages arising out of or related to "bodily injury" or "property damage", whether such "bodily injury" or "property damage" is known or unknown,

(a)   which first occurred prior to the inception date of this policy (or the retroactive date of this policy, if any; whichever is earlier); or

(b)   which are, or are alleged to be, in the process of occurring as of the inception date of the policy (or the retroactive date of this policy, if any; whichever is earlier) even if the "bodily injury" or "property damage" continues during this policy period.

2.   Any damages arising out of or related to "bodily injury" or "property damage", whether known or unknown, which are in the process of settlement, adjustment or "suit" as of the inception date of this policy, if any; whichever is earlier).

We shall have no duty to defend any insured against any loss, claim, "suit", or other proceeding alleging damages arising out of or related to "bodily injury" or "property damage" to which this endorsement applies.

This exclusion will be referred to herein as "the Pre-Existing Damage Exclusion."

## DECLARATORY JUDGMENT REGARDING THE EXTENT OF ADMIRAL'S DUTY TO INDEMNIFY SMM

33.

Admiral incorporates by reference its allegations set forth in the preceding paragraphs as though set forth specifically herein.

34.

Based on the facts and circumstances presented, Admiral seeks the following declarations:

(1) The expenses incurred by WGI to repair, replace or correct SMM's defective work, including expenses to access the work, do not constitute "property damage" under the Admiral Policy;

(2) Exclusions (j)(5), (j)(6), (l), and (m) apply so as to preclude coverage for damages awarded against SMM caused to other non-defective work or property of others;

(3) WGI's claim against SMM for legal fees and expenses are not covered by the Admiral Policy;

(4) The Pre-Existing Damages Exclusion applies so as to limit Admiral's coverage obligations, if any, to the terms of the policy period in which the damage first occurred; and

(5) The single occurrence limit of $1,000,000 would apply to Admiral's coverage obligations, if any.

14

35.

WHEREFORE, Admiral seeks a declaration of its obligations under all terms, conditions and exclusions in the Admiral Policy (whether expressly mentioned in this Complaint or not), as well as under relevant legal principles and public policy concerns, with a jury to resolve all issues so triable.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Philip W. Savrin*
Philip W. Savrin
psavrin@fmglaw.com

Attorney for Plaintiff

100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)